**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | |
|---|---|
| MILAUNCRE MAYHONE and CATHERINE ROUSSEAU, individually and on behalf of all others similarly situated, | Case No. 1:25-cv-08956 |
| *Plaintiffs*, | |
| v. | |
| MW SERVICES LIMITED; WOW SERVICES LIMITED; WOWCOM SERVICES, INC.; CYBERHORIZON LIMITED; and ARENA ENTERTAINMENT LIMITED | |
| *Defendants*. | |

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs Milauncre Mayhone and Catherine Rousseau ("Plaintiffs") bring this case, individually and on behalf of all others similarly situated, against Defendants MW Services Limited, WOW Services Limited, WOWCom Services, Inc., CyberHorizon Limited, and Arena Entertainment Limited ("WOW Vegas" or "Defendants") to enjoin their operation of illegal online casino games and to seek restitution, damages, and other appropriate relief. Plaintiffs allege as follows upon personal knowledge as to themselves and their own acts and experiences, and upon information and belief, including investigation conducted by their attorneys, as to all other matters.

### NATURE OF THE ACTION

1.     This action arises from a predatory scheme orchestrated by Defendants through their illegal online casino platform, WOW Vegas. Defendants lure consumers by falsely marketing WOW Vegas as a harmless "social casino" that only offers free-to-play entertainment. But in reality, WOW Vegas is an illegal gambling operation that profits from players wagering

1

and losing real money on virtual slot machines and other casino-style games.

2.     On wowvegas.com, players buy chips, gamble, and cash out their winnings—just like at a regular casino. But Defendants knew that openly selling casino chips would expose WOW Vegas as an illegal online casino.

3.     To hide the true nature of their gambling operation, Defendants claim that the only chips they sell to consumers are harmless tokens called "WOW Coins," which can only be used for "casual" gameplay on the platform, have no real-world value, and can never be cashed out. But here's the catch: Defendants bundle every purchase of WOW Coins with a second type of token called "Sweeps Coins" as a supposedly free bonus. Unlike WOW Coins, Sweeps Coins can be wagered on casino games and cashed out for real money at a fixed 1:1 ratio to the U.S. Dollar—exposing Sweeps Coins as a clear vehicle for real-money gambling.

4.     Defendants' pricing structure confirms that the true purpose of these transactions is to sell Sweeps Coins—not WOW Coins. Every dollar spent buys players an equivalent amount of Sweeps Coins, plus an enormous quantity of WOW Coins. For example, $20 buys 20 Sweeps Coins (and 1,030,000 WOW Coins), $30 buys 30 Sweeps Coins (and 1,500,000 WOW Coins), and so on. Despite Defendants' claim that players are purchasing harmless virtual tokens, the pricing structure and game play reveal that Sweeps Coins—not WOW Coins—are the real product being sold to consumers. The WOW Coins merely serve to deceive regulators and lure players under the guise of "safe" entertainment.

5.     Virtual gambling is highly addictive and strictly regulated in Illinois. By law, these games can only be offered by licensed operators in licensed, physical locations, where the Illinois Gaming Board ensures fair play and enforces consumer protection standards. Gambling can never be offered to consumers over the Internet, as online gambling is expressly prohibited

in Illinois. *See* 720 ILCS 5/28-1(a)(12) (criminalizing the operation of an "Internet site that permits a person to play a game of chance or skill for money or other thing of value").

6.      By offering Sweeps Coins that can be wagered on games of chance over the Internet and redeemed for real money, Defendants are operating an unlicensed and illegal online casino. And without any oversight or accountability, Defendants flout Illinois gambling regulations by, for example, allowing individuals under the age of 21 to gamble on their platform in violation of state law designed to protect minors, 230 ILCS 10/11(10); 230 ILCS 40/40; 230 ILCS 10/18(b)(1), and failing to provide gambling addiction resources for problem gamblers. 230 ILCS 10/13.1(a); 11 Ill. Admin. Code § 1800.1750.

7.      Defendants' misconduct inflicts severe harm on vulnerable populations, especially individuals prone to gambling addiction and younger consumers targeted through their "free play" marketing. Defendants flood social media platforms with catchy ads, influencer videos, and flashy visuals, making their games seem safe, fun, and harmless. By masking their real-money gambling platform as just another "social casino," Defendants create exactly the kind of dangerous environment that Illinois gambling laws were designed to prevent. This deliberate obfuscation exposes Illinois consumers to significant risks of financial ruin, psychological distress, and gambling addiction.

8.      Accordingly, Plaintiffs, on behalf of themselves and other similarly situated individuals, bring this lawsuit to expose Defendants' predatory practices, recover funds lost by their victims, and dismantle their deceptive and unregulated gambling operations.

## PARTIES

9.      Plaintiff Milauncre Mayhone is a natural person and citizen of the State of Illinois.

10.     Plaintiff Catherine Rousseau is a natural person and citizen of the State of Illinois.

11.     Defendant MW Services Limited is a Gibraltar company with its principal place of business located at 5-9 Main Street, Gibraltar GX11 1AA. MW Services Limited launched WOW Vegas in 2021. On information and belief, MW Services Limited, together with the other Defendants, owns, operates, and controls the WOW Vegas online casino platform and actively participates in the unlawful conduct described herein. Additionally, MW Services Limited "is the proprietor or authorized licensee of all intellectual property" related to WOW Vegas's content, including wowvegas.com and all of the games on the platform.

12.     Defendant WOW Services Limited is a company incorporated and headquartered in the Isle of Man, with its principal place of business located at Sovereign House, 4 Christian Road, Douglas, Isle of Man IM1 2SD. On information and belief, WOW Services Limited, together with the other Defendants, operates and controls the WOW Vegas online casino platform and actively participates in the unlawful conduct described herein. Defendant Arena Entertainment Limited is the sole member of WOW Services Limited.

13.     Defendant WOWCom Services, Inc. is a Delaware corporation with its registered office located at 1013 Centre Road, Suite 403-B, Wilmington, Delaware. On information and belief, WOWCom Services, Inc. serves as the United States-based subsidiary for Defendants, facilitating U.S. operations for the WOW Vegas online casino platform.

14.     Defendant CyberHorizon Limited, f/k/a WOW Entertainment Limited, is a company incorporated and headquartered in the Isle of Man, with its principal place of business also located at Sovereign House, 4 Christian Road, Douglas, Isle of Man IM1 2SD. CyberHorizon Limited owns the trademarks associated with the WOW Vegas brand. On information and belief, CyberHorizon Limited exercises overarching control and management of

the WOW Vegas platform, coordinating the actions of its subsidiaries, MW Services Limited,
WOW Services Limited, and WOWCom Services, Inc., to collectively operate and profit from
Defendants' illegal gambling activities in Illinois. Defendant Arena Entertainment Limited is the
sole member of CyberHorizon Limited.

15. Defendant Arena Entertainment Limited is a company incorporated and
headquartered in Malta, with its principal place of business located at Level 5, St. Julian's
Business Centre, Elia Zammit Street, St. Julians, Malta STJ 3153. Arena Entertainment is the
sole member of CyberHorizon Limited and WOW Services Limited.

16. Defendants MW Services Limited, WOW Services Limited, WOWCom Services,
Inc., CyberHorizon Limited, and Arena Entertainment Limited operate collectively as an
integrated enterprise. Defendants WOW Services Limited, CyberHorizon Limited, and Arena
Entertainment Limited share the same or similar current and past directors. On information and
belief, Defendants MW Services Limited and WOWCom Services, Inc. also share these current
and past directors. CyberHorizon Limited acts as the parent company, owning trademarks and
directing corporate strategy. MW Services Limited serves as the primary operating entity for the
WOW Vegas platform, with WOW Services Limited and WOWCom Services, Inc. supporting
its operations in other jurisdictions, including the United States. Through this coordinated
corporate structure, Defendants jointly operate, market, and profit from the WOW Vegas
platform.

## JURISDICTION AND VENUE

17. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)
because (i) at least one member of the Class is a citizen of a different state than Defendants, (ii)
the amount in controversy exceeds $5,000,000, exclusive of interests and costs, and (iii) none of

5

the exceptions under that subsection apply to this action.

18.     This Court has personal jurisdiction over Defendants because they conduct substantial, continuous, and systematic business in Illinois—including by entering into contracts with Illinois residents and engaging in ongoing economic relationships with them. Furthermore, Defendants purposefully directed their activities to the District by providing services to the residents of this District that they knew would be used within this District, advertising their services in Illinois, and actually profiting from the resulting gambling taking place in Illinois on their platform.

19.     Venue is proper in this District under the provision of 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this judicial District, Defendants are subject to personal jurisdiction in this District, and Defendants transact business in this District. Further, venue is proper as to MW Services Limited, WOW Services Limited, CyberHorizon Limited, and Arena Entertainment Limited under 28 U.S.C. § 1391(c)(3) because they are foreign entities.

## STATEMENT OF FACTS

### I.     Defendants Operate an Online Casino That Facilitates and Profits Enormously from Real-Money Gambling.

20.     Lawful gambling has historically been limited to physical casinos or authorized venues where regulatory agencies and oversight bodies closely monitor gambling operations and enforce compliance with established standards. These controlled environments are designed to protect consumers by promoting fairness, ensuring transparency, and maintaining safeguards against exploitation and misconduct.

21.     With advancements in technology, gambling has expanded beyond physical venues to online platforms, creating new opportunities and challenges for regulators. States that

permit online gambling have adapted their legal frameworks to uphold the same standards of consumer protection and regulatory accountability established for traditional casinos.

22.     In states where online gambling is permitted, casino platforms are required to operate transparently, offering clear money-for-chance exchanges that are explicitly acknowledged as gambling and are subject to strict regulatory oversight to ensure compliance with state laws.

23.     Online gambling is not permitted in Illinois. The Illinois Legislature expressly prohibits any "Internet site that permits a person to play a game of chance or skill for money or other thing of value." 720 ILCS 5/28-1(a)(12). This prohibition reflects the state's public policy against online gambling, ensuring that consumers are not exposed to the risks of fraudulent or predatory practices commonly associated with such operations, especially where, as here, they are accessible 24 hours-a-day, 7 days-a-week through computers and mobile devices. *See* WOW Vegas, *General FAQ,* https://perma.cc/3QR9-993P (last accessed Jul. 29, 2025) ("[V]isit our site on your cell phone or tablet and enjoy WOW Vegas on-the-go.").

24.     Defendants blatantly disregard Illinois' clear prohibition on online gambling. As discussed below, the WOW Vegas casino platform allows players to purchase and wager "Sweeps Coins"—digital tokens that, like chips in a brick-and-mortar casino, can be redeemed at a 1:1 ratio to the U.S. Dollar—on games of chance, including slot machines, bingo, blackjack, roulette, and other casino-style offerings. Effectively, Defendants operate an unlicensed and illegal online casino within Illinois.

25.     Other states have explicitly recognized as much. The Louisiana Gaming Control Board, for example, issued a cease-and-desist letter to WOW Vegas, branding it an "illegal operator" of gambling in the state. Louisiana Gaming Control Board, *Illegal Operators,*

https://lgcb.dps.louisiana.gov/illegal-operators/ (last accessed Jul. 23, 2025). Defendants have since announced they will stop allowing individuals in Louisiana to access or play WOW Vegas.

### A. Defendants' Casino Games Are Games of Chance.

26. Defendants' casino platform hosts casino-style games that are unmistakably games of chance, including slot machines and bingo. The outcomes of these games are entirely determined by algorithms designed to simulate randomness, with no opportunity for skill or strategy to influence the results.

27. Under Illinois law, a game of chance involves any activity where an outcome is determined predominantly by chance rather than skill. *Dew-Becker v. Wu*, 178 N.E.3d 1034, 1040 (Ill. 2020). Defendants' games fall squarely within this definition because players wager Sweeps Coins on virtual casino-style games whose outcomes are determined exclusively by random number generators ("RNGs"), precisely replicating the randomness and unpredictability of physical slot machines and other chance-based games found in brick-and-mortar casinos.

28. Defendants emphasize the purely chance-based nature of their games to entice players with the prospect of substantial payouts. Defendants frequently promote the potential for large winnings on their branded social media channels, an example of which is illustrated in Figure 1 below:



**(Figure 1)**

29.     Figure 1 prominently advertises a massive payout on Defendants' "Sugar Rush 1000" slot game, where a player's wager resulted in a 274,468 SC (Sweeps Cash) win. This form of marketing strategically exploits consumers' hope for enormous returns despite slim odds. The Sugar Rush 1000 game itself is depicted in Figure 2 below:



**(Figure 2)**

30.     The absence of skill components further underscores the games' reliance on chance. For instance, the virtual slot machines require players merely to click a button to spin

reels, with the outcomes fully dictated by RNGs. Other popular games available on Defendants'

platform—such as bingo and scratch cards—likewise offer no opportunity for player skill,

relying exclusively on pure luck to determine winners and losers.

31.     Defendants purposefully replicate key features of licensed casino games to deliver

an authentic gambling atmosphere. The visual design—including spinning reels, celebratory

animations, jackpot notifications, and dynamic audio effects—is intentionally crafted to trigger

psychological responses identical to those experienced in traditional casinos. These design

choices intentionally evoke powerful psychological triggers known to induce gambling behavior,

fueling compulsive engagement and reinforcing the illusion of potential financial reward.

32.     By offering these games of chance, Defendants are operating an unregulated

online casino in violation of Illinois law, which explicitly prohibits gambling on games of chance

conducted over the Internet. 720 ILCS 5/28-1(a)(12). Defendants' deliberate creation of realistic

casino experiences reinforces the unlawful nature of their operations and amplifies the risks to

Illinois residents.

**B.     The Dual-Currency System.**

33.     In an attempt to circumvent this prohibition, Defendants brand their casino

platform as a free to play, "social casino." Defendants even prominently represent that the WOW

Vegas "WEBSITE, PLATFORM AND/OR GAMES DO NOT OFFER REAL MONEY

GAMBLING OF ANY TYPE."[1] This façade relies entirely on a dual-currency system

intentionally designed to obscure the fact that players are, in fact, engaging in real-money

gambling.

---

[1] WOW Vegas, *Terms & Conditions,* https://perma.cc/V6RR-SPZA (Jan. 23, 2025) (emphasis in original).

34.     WOW Vegas players are introduced to two types of virtual currency: WOW Coins, which hold no monetary value and are marketed as being solely for entertainment purposes, and Sweeps Coins (often referred to as "SC" on the WOW Vegas platform), which can be redeemed for real money at a 1:1 exchange rate to the U.S. Dollar and serves as the true currency of Defendants' illegal gambling operations.

35.     WOW Coins are presented as the primary currency for casual gameplay. Players can earn a limited number of WOW Coins through daily logins or promotions and thereafter may purchase more WOW Coins to keep playing. Defendants make clear that "WOW Coins can be purchased to play games for fun only and cannot be cashed out or redeemed for any prizes."

36.     Sweeps Coins, on the other hand, are the true currency driving Defendants' unlawful online gambling operations. Although Defendants market Sweeps Coins as merely a bonus token included with WOW Coin purchases, Sweeps Coins have direct monetary value and can be redeemed at a fixed 1:1 ratio with the U.S. Dollar.

37.     Thus, despite Defendants' deceptive claims, Sweeps Coins function as real currency by directly linking virtual wagers to actual monetary value, allowing players to seamlessly convert their virtual gambling winnings into real-world money.

38.     Though Defendants tell players that no purchase is necessary to obtain Sweeps Coins, this representation is highly misleading. Players may acquire a limited amount of free Sweeps Coins through occasional promotions—such as receiving a nominal amount of Sweeps Coins as a daily login bonus or three Sweeps Coins by completing a cumbersome mail-in request—but these methods are deliberately obscure, impractical, and insufficient for regular gameplay. Ultimately, once a player's promotional Sweeps Coins are exhausted, the only viable way to continue gambling is to purchase additional Sweeps Coins.

39.     To obtain more Sweeps Coins, players must buy coin bundles containing both WOW Coins and Sweeps Coins. Defendants characterize these transactions as primarily WOW Coin purchases with Sweeps Coins supposedly included as a "free" bonus. However, the pricing structure makes it clear that players are actually paying for Sweeps Coins.

40.     For every dollar spent on the coin bundles, players receive an equivalent amount of Sweeps Coins, as illustrated in Figure 3, below. For example, $20 buys 20 Sweeps Coins (and 1,030,000 WOW Coins), $30 buys 30 Sweeps Coins (and 1,500,000 WOW Coins), $100 buys 100 Sweeps Coins (and 5 million WOW Coins), and $200 buys 200 Sweeps Coins (and 10,000,000 WOW Coins). This pricing structure shows that WOW Coins serve only as a superficial disguise for the transaction of Sweeps Coins.



**(Figure 3)**

41.     Plaintiffs Rousseau and Mayhone and, on information and belief, the vast majority of players on the WOW Vegas platform regularly buy additional coin bundles when they run out of Sweeps Coins even when they already possess hundreds of thousands or even millions of unused WOW Coins. The fact that players are making these repeated purchases when they have ample WOW Coins confirms that these transactions are driven entirely by the desire to obtain Sweeps Coins for real-money gambling, rather than for the WOW Coins that Defendants claim are the focus of the transactions.

42.     That Sweeps Coins are the focus of WOW Vegas's gameplay is further

underscored by Defendants' advertisements. As reflected in Figures 1 and 5, Defendants point to large jackpots in an attempt to attract and engage players. These jackpots are denominated in Sweeps Coins—which anyone that has played WOW Vegas knows is a 1:1 equivalent to a dollar amount—not WOW Coins.

43.     Defendants' dual-currency structure transforms their platform into an unregulated online casino where players use real money to gamble on games of chance. Courts throughout the country have found that when players spend money to obtain more "entries" or "bonus currency" despite already possessing unused amounts of the purported product (here, WOW Coins), there is unmistakable evidence that the "sweepstakes" or "promotion" is merely a front for illegal gambling.

## II.     WOW Vegas Calls Itself a "Social Casino" to Lure Consumers and Hide Its Illegal Gambling Operation.

44.     WOW Vegas deceptively markets itself as a safe, risk-free "social casino" to circumvent gambling regulations and lure consumers into believing its platform offers harmless entertainment without any financial risk. Defendants tell consumers to "[e]njoy the fun for free. Focus on having fun with our social casino community and *don't worry about parting with your cash*." (emphasis added).

45.     As part of its scheme to brand itself as a mere "social casino," WOW Vegas explicitly and fraudulently represents to consumers through its Terms and Conditions that its "WEBSITE, PLATFORM AND/OR GAMES DO NOT OFFER REAL MONEY GAMBLING OF ANY TYPE." (emphasis in original). Defendants even go so far as to represent that "WOW Vegas is absolutely legal," in an effort to portray the platform as a benign, safe environment

13

designed purely for entertainment purposes.[2] These false promises intentionally deceive consumers, leading them to believe they are participating in risk-free social gameplay rather than actual real-money gambling, even when wagering with Sweeps Coins.

46.     Once consumers register and begin playing, however, WOW Vegas strategically guides them away from purely casual gameplay (using WOW Coins) and toward real money gambling (using Sweeps Coins).

47.     To that end, every time a player selects a game on WOW Vegas' platform, a pop-up box appears that presents options to gamble using WOW Coins or Sweeps Coins. Regardless of which game users choose to play, the Sweeps Coins option—representing real-money gambling—is automatically pre-selected by default, as illustrated in Figure 4 below (depicting the interface for WOW Vegas' slot game "Moneyfest"):



**(Figure 4)**

48.     At the bottom of this pop-up, WOW Vegas strategically displays a toggle that

---

[2] WOW Vegas, *General FAQ,* https://perma.cc/3QR9-993P (last accessed Jul. 29, 2025).

allows players to effortlessly switch between wagering non-redeemable WOW Coins and real-money Sweeps Coins with just a single click. This mechanism is intentionally designed to minimize friction and encourage players to transition swiftly from risk-free gaming to real-money gambling. Consequently, many players initially drawn by the promise of harmless social gameplay unknowingly shift into high stakes wagering, often without recognizing the significant financial risks until substantial losses have been incurred.

49.     WOW Vegas further manipulates players by employing celebratory animations, enticing sound effects, and other powerful psychological triggers—classic features of traditional gambling found in brick-and-mortar casinos—to sustain player engagement and maximize spending. This exploitation particularly endangers vulnerable populations, including those susceptible to gambling addiction, who are often unaware of the potential for financial devastation until it is too late.

## III.    Defendants' Gambling Platform Fails to Provide Basic Consumer Protections That Are Required by Illinois Law.

50.     The harm caused by WOW Vegas' illegal gambling operation is further exacerbated by Defendants' lack of accountability and regulatory oversight. Unlike licensed casinos, which must comply with strict requirements to ensure fairness, transparency, and consumer protections, Defendants operate without these safeguards. The absence of oversight leaves players vulnerable to unfair practices, such as manipulated game outcomes, misleading promotions, and nonexistent or inadequate mechanisms to address problem gambling.

51.     This is not just a theoretical danger—Defendants' online casinos actively undermine critical consumer protections required by Illinois law. For example, Defendants allow anybody over the age of 18 to gamble on their casino platforms in complete disregard for the laws prohibiting individuals under the age of 21 to gamble in Illinois. *See, e.g.*, 230 ILCS

10/11(10) ("A person under age 21 shall not be permitted on an area of a riverboat or casino where gambling is being conducted . . . ."); 230 ILCS 40/40 ("No licensee shall cause or permit any person under the age of 21 years to use or play a video gaming terminal."); 230 ILCS 10/18(b)(1) ("A person is guilty of a Class B misdemeanor for . . . permitting a person under 21 years to make a wager . . . ."). Defendants also disregard the consumer protection laws that require casinos to conspicuously post signs that inform patrons how to obtain assistance with problem gambling and provide instructions on accessing the Illinois Gaming Board Self-Exclusion Program. *See* 230 ILCS 10/13.1(a) (Compulsive gambling) ("Each licensed owner shall post signs with a statement regarding obtaining assistance with gambling problems" at "[e]ach entrance and exit" and "[n]ear each credit location."); 11 Ill. Admin. Code § 1800.1750.

52.     Rather than offering substantive assistance to players facing gambling addiction, Defendants provide only superficial and deceptive assurances about "Responsible Gaming," framing any issues as excessive "online social gaming" rather than gambling addiction. *See* WOW Vegas, *Responsible Gaming,* https://perma.cc/CM22-RMCM (last updated April 4, 2024) ("We believe it is our responsibility to you, our customers, to ensure that you enjoy your experience on our platform, while remaining fully aware of the potential risks that can be associated with *online social gaming* if you don't remain in control.") (emphasis added). Notably, Defendants' Responsible Gaming page doesn't direct consumers to any gambling addiction resources. Instead, it merely informs users that they can take a short "break-in-play" or "self-exclude" their account for a set period of time.

53.     In fact, the only external resource mentioned on the Responsible Gaming page is a reference to Computer Gaming Addicts Anonymous buried at the very bottom:

> Should you wish to access help and support services for people who have been
> adversely affected by gaming, we advise you to get in touch with both the Computer

Gaming Addicts Anonymous (CGAA) using the following email address: helpline@cgaa.info.

54.     Defendants fail to provide a link or address to the organization's website and is seemingly unaware that Computer Gaming Addicts Anonymous—the sole resource mentioned on their Responsible Gaming page—changed its name to Gaming Addicts Anonymous more than three years ago. More to the point, Gaming Addicts Anonymous is an organization that assists individuals struggling with video game addiction—and does not provide support for gambling addiction at all. This token effort to feign responsibility demonstrates Defendants' deliberate attempt to obscure the true nature of their operations and evade accountability for the significant harm they inflict.

55.     By deliberately withholding critical—and legally required—resources from their players, Defendants violate Illinois law and sacrifice the well-being of vulnerable consumers to maintain the fiction that their platform is a harmless "social casino," rather than the unlawful gambling operation it truly is.

**IV.     WOW Vegas Aggressively Advertises on Social Media.**

56.     Defendants leverage extensive social media campaigns to promote WOW Vegas, reaching millions of consumers across platforms such as Instagram and X.

57.     As illustrated in Figure 1, above, and Figure 5, below, Defendants' marketing frequently showcases players winning massive amounts of Sweep Coins on their platform.



**(Figure 5)**

58.     Figure 5 prominently advertises an "Epic win of SC 577,862.95 from one spin!"
By prominently advertising these exceedingly rare outcomes, Defendants exploit players'
cognitive biases, creating a misleading impression that such extraordinary wins are achievable
and frequent, thereby encouraging impulsive and risky gambling behaviors. Defendants'
deliberate use of this deceptive marketing tactic exploits consumers' cognitive biases, driving
them to make impulsive wagers and chase unrealistic payouts, often resulting in significant
financial losses and gambling-related harm.

59.     By showcasing substantial wins, Defendants strategically employ social proof and
aspirational marketing to give the misleading impression that large payouts are common,
enticing users to shift from casual play into real-money gambling with Sweeps Coins.

60.     Defendants also heavily promote themselves through a high-profile partnership
with celebrity Paris Hilton. By prominently featuring Hilton on the WOW Vegas homepage and
strategically aligning with her glamorous lifestyle and vast social media following, WOW Vegas
seeks to enhance its perceived legitimacy and allure, particularly targeting younger and
impressionable audiences. Hilton's involvement serves to glamorize and normalize the platform,

reinforcing the misleading message that WOW Vegas provides a safe, trendy, and risk-free experience, further obscuring its true nature as a real-money gambling platform. The WOW Vegas homepage, depicted in Figure 6, illustrates Defendants' calculated exploitation of Hilton's celebrity status to attract, mislead, and ultimately ensnare consumers:



**(Figure 6)**

61.     The strategy behind Defendants' partnership with Hilton is clear: by leveraging the global admiration and widespread influence associated with Hilton's celebrity status, WOW Vegas seeks to normalize online gambling, bolster consumer trust, and effectively obscure the inherent risks of gambling behind an enticing façade of entertainment and social glamour.

62.     Through their deceptive marketing tactics, Defendants attract users who remain largely unaware of the serious financial and emotional risks involved. This strategy enables WOW Vegas to maximize profits by exploiting consumer ignorance, all while evading the accountability, regulatory oversight, and essential consumer protections mandated for legitimate gambling operations.

## FACTS SPECIFIC TO PLAINTIFF MILAUNCRE MAYHONE

63.     Plaintiff Mayhone has been playing casino games on WOW Vegas since 2022.

64.     After using the limited number of Sweeps Coins obtained through Defendants' promotions, Plaintiff Mayhone purchased Sweeps Coins through Defendants' online store in order to continue playing. When Plaintiff Mayhone ran out of Sweeps Coins, she would purchase more even though she still had many WOW Coins.

65.     Plaintiff Mayhone played various games of chance on WOW Vegas—including slot machine games such as Joker Jewels, Sticky Piggy and Hot to Burn—where she would wager Sweeps Coins for the chance to win real cash prizes.

66.     Since she started playing, Plaintiff Mayhone has wagered and lost (and Defendants therefore won) thousands of dollars on Defendants' games of chance. Just in the last six months, Plaintiff Mayhone has wagered and lost (and Defendants therefore won) more than $100 on Defendants' games of chance.

### FACTS SPECIFIC TO PLAINTIFF CATHERINE ROUSSEAU

67.     Plaintiff Rousseau has been playing casino games on WOW Vegas since 2024.

68.     After using the limited number of Sweeps Coins obtained through Defendants' promotions, Plaintiff Rousseau purchased Sweeps Coins through Defendants' online store in order to continue playing. When Plaintiff Rousseau ran out of Sweeps Coins, she would purchase more even though she still had many WOW Coins.

69.     Plaintiff Rousseau played various games of chance on WOW Vegas—including slot machine games—where she would wager Sweeps Coins for the chance to win real cash prizes.

70.     Since she started playing, Plaintiff Rousseau has wagered and lost (and Defendants therefore won) thousands of dollars on Defendants' games of chance. Just in the last six months, Plaintiff Rousseau has wagered and lost (and Defendants therefore won) more than $100 on Defendants' games of chance.[3]

---

[3]     Plaintiffs notified Defendants of this dispute on July 25, 2025. Defendants have not responded as of the filing of this Complaint.

## CLASS ACTION ALLEGATIONS

71.  **Class Definitions**: Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23(b)(2) and (b)(3) on behalf of themselves, an Illinois Class and an Illinois Loss Recovery Subclass (collectively, the "Classes") defined as follows:

> **Illinois Class**: All persons in Illinois who have lost money wagering on Defendants' online casino games.

> **Illinois Loss Recovery Subclass**: All persons in Illinois who have lost at least $50 wagering on Defendants' online casino games.

Excluded from the Classes are: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which the Defendants or their parents have a controlling interest and their current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Classes; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

72.  **Numerosity**: The exact number of members of the Classes is unknown and not available to Plaintiffs at this time, but it is clear that individual joinder is impracticable. On information and belief, thousands of consumers fall into the definition of the Illinois Class and the Illinois Loss Recovery Subclass. Members of the Classes can be identified through Defendants' records, discovery, and other third-party sources.

73.  **Commonality and Predominance**: There are many questions of law and fact common to the claims of Plaintiffs and the putative Classes, and those questions predominate over any questions that may affect individual members of the Classes. Common questions

include, but are not limited to, the following:

(a)     Whether Defendants are the proprietors for whose benefit the online casino games are played;

(b)     Whether Defendants' online casino games are illegal under Illinois gambling laws;

(c)     Whether Plaintiffs and each member of the Classes lost money wagering on Defendants' online casino games;

(d)     Whether Defendants' online casino games are games of chance under Illinois law;

(e)     Whether Plaintiffs and the Illinois Loss Recover Subclass members are entitled to recover their gambling losses under the Illinois Loss Recovery Act, 720 ILCS 5/28-8;

(f)     Whether Defendants have violated the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq.*; and

(g)     Whether Defendants have been unjustly enriched as a result of their conduct.

74.     **Typicality**: Plaintiffs' claims are typical of the claims of other members of the Classes in that Plaintiffs and the members of the Classes sustained damages arising out of Defendants' uniform wrongful conduct.

75.     **Adequate Representation:** Plaintiffs will fairly and adequately represent and protect the interests of the Classes and has retained counsel competent and experienced in complex litigation and class actions. Plaintiffs' claims are representative of the claims of the other members of the Classes, as Plaintiffs and each member of the Classes lost money playing Defendants' illegal casino games. Plaintiffs also have no interests antagonistic to those of the Classes, and Defendants have no defenses unique to Plaintiffs. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Classes, and have the financial resources to do so. Neither Plaintiffs nor their counsel have any interest adverse to the Classes.

76. **Policies Generally Applicable to the Class**: This class action is appropriate for certification because Defendants have acted or refused to act on grounds generally applicable to the Classes as a whole, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward members of the Classes, and making final injunctive relief appropriate with respect to the Classes as a whole. Defendants' policies and practices challenged herein apply to and affect members of the Classes uniformly, and Plaintiffs' challenge of these practices and policies hinges on Defendants' conduct with respect to the Classes as a whole, not on facts or law applicable only to Plaintiffs. The factual and legal bases of Defendants' liability to Plaintiffs and to the other members of the Classes are the same.

77. **Superiority**: This case is also appropriate for class certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy given that joinder of all parties is impracticable. The harm suffered by the individual members of the Classes is likely to have been relatively small compared to the burden and expense of prosecuting individual actions to redress Defendants' wrongful conduct. Absent a class action, it would be difficult for the individual members of the Classes to obtain effective relief from Defendants. Even if members of the Classes themselves could sustain such individual litigation, it would not be preferable to a class action because individual litigation would increase the delay and expense to all parties and the Court and require duplicative consideration of the legal and factual issues presented. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single Court. Economies of time, effort, and expense will be fostered, and uniformity of decisions will be ensured.

78. Plaintiffs reserve the right to revise each of the foregoing allegations based on

facts learned through additional investigation and in discovery.

**FIRST CAUSE OF ACTION**
**Violation of the Illinois Loss Recovery Act**
**720 ILCS 5/28-8**
**(On behalf of Plaintiffs and the Illinois Loss Recovery Subclass)**

79.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

80.     Plaintiffs bring this claim on behalf of themselves and the Illinois Loss Recovery

Subclass under the Illinois Loss Recovery Act, 720 ILCS 5/28-8, which was enacted to

effectuate the State of Illinois' public policy against gambling.

81.     720 ILCS 5/28-8(a) provides that:

> Any person who by gambling shall lose to any other person, any sum of money or
> thing of value, amounting to the sum of $50 or more and shall pay or deliver the
> same or any part thereof, may sue for and recover the money or other thing of value,
> so lost and paid or delivered, in a civil action against the winner thereof, with costs,
> in the circuit court.

82.     The Illinois Supreme Court has found that the "purpose of section 28-8(a) is not

simply to undo illegal gambling transactions but 'to deter illegal gambling by using its recovery

provisions as a powerful enforcement mechanism.'" *Dew-Becker*, 178 N.E.3d at 1037-38

(quoting *Vinson v. Casino Queen, Inc.*, 123 F.3d 655, 657 (7th Cir. 1997)).

83.     Plaintiffs, Illinois Loss Recovery Subclass members, and Defendants are

"persons" under 720 ILCS 5/28-8(a). *See* 720 ILCS 5/2-15 ("Person" means "an individual,

natural person, public or private corporation . . . partnership, unincorporated association, or other

entity.").

84.     The activity of "gambling" includes anyone who, *inter alia*, "knowingly

establishes, maintains, or operates an Internet site that permits a person to play a game of chance

or skill for money or other thing of value by means of the Internet," 720 ILCS 5/28-1(a)(12),

"knowingly plays a game of chance or skill for money or other thing of value," 720 ILCS 5/28-

1(a)(1), or "knowingly . . . uses . . . any gambling device." 720 ILCS 5/28-1(a)(3).

85.     The Illinois Loss Recovery Act defines a "gambling device" as a "slot machine or other machines or device for the reception of money or other thing of value" that on "chance or skill . . . is staked, hazarded, bet, won, or lost." 720 ILCS 5/28-2(a).

86.     Sweeps Coins constitute money or a thing of value because their value is directly tied to the U.S. Dollar at a 1:1 ratio and they can be redeemed for cash through Defendants' platform. Just like casino chips in a brick-and-mortar casino, Sweeps Coins serve as a proxy for real currency, allowing players to wager, win, and ultimately cash out their balances in a form that retains actual monetary value.

87.     Defendants' online casino platform—WOW Vegas—is an Internet site that permits consumers to play games of chance (*e.g.*, online slot machines) for money or other things of value (Sweeps Coins).

88.     Every casino game offered on Defendants' online platform is a "gambling device" because they accept money or other valuable items (Sweeps Coins) from players, operate on chance using random number generators, and enable players to stake, hazard, and bet money or other valuable items (Sweeps Coins) with the potential to win or lose money or other valuable items (Sweeps Coins).

89.     Defendants' games of chance do not permit players to gamble directly against other players. Rather, like the "house" in a traditional brick-and-mortar casino, Defendants are the "winners" under the statute because they have a direct stake in the result of the gambling. When players wager Sweeps Coins on games of chance and win, they can redeem their winnings for cash at a 1:1 ratio with the U.S. Dollar—meaning Defendants incur the equivalent monetary loss. Conversely, when players bet Sweeps Coins on games of chance and lose, Defendants

retain the full value of the lost Sweeps Coins, just as traditional casinos profit from losing bets placed against the house.

90.     By wagering and losing Sweeps Coins on Defendants' casino platform, Plaintiffs and each member of the Illinois Loss Recovery Subclass gambled and lost money or things of value.

91.     Plaintiffs and the members of the Illinois Loss Recovery Subclass have each lost more than $50 gambling on Defendants' platform.

92.     Defendants own, operate, and control the gambling games described herein, and directly profited from Plaintiffs' and the Illinois Loss Recovery Subclass members' gambling losses. Defendants are therefore the "winners" under 720 ILCS 5/28-8(a) of all moneys lost by Plaintiffs and the Illinois Loss Recovery Subclass members.

93.     Plaintiffs' and the Illinois Loss Recovery Subclass members' losses occurred in Illinois because Defendants' online casino games were played by Illinois residents on computers, mobile phones, and mobile devices in the State of Illinois. Defendants had actual knowledge that Plaintiffs and the Illinois Loss Recovery Subclass members reside in Illinois because each of them selected "Illinois" as their state of residence and provided their complete home address pursuant to Defendants' mandatory registration process.

94.     Plaintiffs, on behalf of themselves and the Illinois Loss Recovery Subclass members, seeks an order requiring Defendants to (1) cease the operation of their gambling devices, and (2) return all lost monies, with costs, pursuant to 720 ILCS 5/28-8(a).

**SECOND CAUSE OF ACTION**
**Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act**
**815 ILCS §§ 505/1, *et seq.***
**<u>(On behalf of Plaintiffs and the Illinois Class)</u>**

95.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

96. The Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS §§ 505/1, *et seq.*, protects consumers and competitors by promoting fair competition in commercial markets for goods and services.

97. The ICFA prohibits any unlawful, unfair, or fraudulent business acts or practices including the employment of any deception, fraud, false pretense, false promise, false advertising, misrepresentation, or the concealment, suppression, or omission of any material fact.

98. The ICFA applies to Defendants' actions and conduct as described herein because it protects consumers in transactions that are intended to result, or which have resulted, in the sale of goods or services.

99. Each Defendant is a "person" as defined by 815 ILCS 505/1(c).

100. Plaintiffs and the Illinois Class are "consumers" under 815 ILCS 505/1(e).

101. Sweeps Coins are "merchandise" within the meaning of 815 ILCS 505/1(b) and Defendants' sale of Sweeps Coins constitutes "trade" or "commerce" within the meaning of 815 ILCS 505/1(f).

102. Defendants' practices described above, including their operation of illegal casino platform and sale of Sweeps Coins, are unfair within the meaning of the ICFA because they offend Illinois' public policy against unlawful and unregulated gambling, *see, e.g.*, 720 ILCS 5/28-7 (Gambling contracts void); *Hall v. Montaleone*, 348 N.E.2d 196, 198 (Ill. App. Ct. 1976) (stating that "gambling contracts or contracts for an immoral or criminal purpose" are "absolutely void and unenforceable" by reason of "public policy"), and were otherwise unethical, oppressive, and unscrupulous and caused substantial injury to the consumers who purchased Sweeps Coins on the WOW Vegas platform. Defendants' conduct is immoral because it is designed to encourage illegal gambling while marketing their platform as a legal simulation of

casino-style games, as well as to exploit psychological triggers associated with gambling and addiction in order to target susceptible populations.

103.    Defendants caused substantial injury to Plaintiffs and the Illinois Class by inducing them to purchase and wager Sweeps Coins through the design of their illegal gambling platform. The injury caused by Defendants' conduct is not outweighed by any countervailing benefits to consumers or competition, and the injury is one that consumers themselves could not reasonably have avoided.

104.    Defendants' unfair practices occurred during the marketing and sale of Sweeps Coins for use on Defendants' illegal gambling platform, and thus, occurred in the course of trade and commerce.

105.    Defendants represent to consumers, including Plaintiffs and the Illinois Class, that their "WEBSITE, PLATFORM AND/OR GAMES DO NOT OFFER REAL MONEY GAMBLING OF ANY TYPE" (emphasis in original) and misleads consumers into believing they are not engaging in gambling by wagering Sweeps Coins on the casino games offered on their platform. Defendants even represent to consumers, including Plaintiffs and the Illinois Class, that "WOW Vegas is absolutely legal."

106.    Further, Defendants conceal from consumers, including Plaintiffs and the Illinois Class, that wagering with Sweeps Coins on their platform constitutes illegal gambling prohibited by state law.

107.    To make matters worse, Defendants' casinos fail to provide the statutorily required consumer protections that every licensed casino in the State of Illinois must provide. For example, Defendants allow anybody over the age of 18 to gamble on their casino platforms in complete disregard of the laws prohibiting individuals under the age of 21 to gamble in

Illinois. *See, e.g.*, 230 ILCS 10/11(10) ("A person under age 21 shall not be permitted on an area of a riverboat or casino where gambling is being conducted . . . ."); 230 ILCS 40/40 ("No licensee shall cause or permit any person under the age of 21 years to use or play a video gaming terminal."); 230 ILCS 10/18(b)(1) ("A person is guilty of a Class B misdemeanor for . . . permitting a person under 21 years to make a wager . . . ."). Defendants also disregard the consumer protection laws that require casinos to conspicuously post signs that inform patrons how to obtain assistance with problem gambling and provide instructions on accessing the Illinois Gaming Board Self-Exclusion Program. *See* 230 ILCS 10/13.1(a) (Compulsive gambling) ("Each licensed owner shall post signs with a statement regarding obtaining assistance with gambling problems" at "[e]ach entrance and exit" and "[n]ear each credit location."); 11 Ill. Admin. Code § 1800.1750.

108.     Defendants aggressively market and advertise their platform on social media while at the same time concealing that it is illegal under state law. As such, Illinois consumers, including Plaintiffs and the Illinois Class, are highly likely to continue to encounter current and future iterations of Defendants' illegal platform absent injunctive relief.

109.     Not only is Defendants' conduct unfair, but as discussed above, Defendants' conduct is also unlawful given that they knowingly maintain and operate "an Internet site that permits a person to play a game of chance or skill for money or other thing of value by means of the Internet," 720 ILCS 5/28-1(a)(12), and otherwise knowingly play games of chance for money or other things of value, 720 ILCS 5/28-1(a)(1), and knowingly use gambling devices, 720 ILCS 5/28-1(a)(3).

110.     As a direct and proximate result of Defendants' violations of the ICFA, Plaintiffs and the Illinois Class members have suffered harm in the form of monies paid and lost for

Defendants' Sweeps Coins.

111.    Plaintiffs, on behalf of themselves and the Illinois Class members, seek an order requiring Defendants to (1) cease the unfair practices described herein, (2) return all monies acquired through any purchase that included the transfer of Sweeps Coins to Plaintiffs and the Illinois Class, and otherwise (3) pay damages, interest, and reasonable attorneys' fees, together with costs and expenses.

### THIRD CAUSE OF ACTION
### Unjust Enrichment
### (On behalf of Plaintiffs and the Illinois Class)

112.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

113.    Plaintiffs and the Illinois Class members have conferred a benefit upon Defendants in the form of the money they paid for the purchase of Sweeps Coins to wager on Defendants' illegal casino platform.

114.    Defendants appreciate and have knowledge of the benefits conferred upon them by Plaintiffs and the Illinois Class.

115.    Under principles of equity and good conscience, Defendants should not be permitted to retain the money obtained from Plaintiffs and the Illinois Class members, which Defendants have unjustly obtained as a result of their unlawful operation of casino games. As it stands, Defendants have retained millions of dollars in profits generated from their unlawful games of chance and should not be permitted to retain those ill-gotten profits.

116.    Accordingly, Plaintiffs and the Illinois Class members seek full disgorgement of all money Defendants have retained as a result of the wrongful conduct alleged herein.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Catherine Rousseau and Milauncre Mayhone, individually and

on behalf of the Classes, respectfully request that this Court enter an Order:

(a)     Certifying this case as a class action on behalf of the Classes defined above, appointing Plaintiffs as Class Representatives, and appointing their counsel as Class Counsel;

(b)     Declaring that Defendants' conduct, as set out above, is unlawful under 720 ILCS 5/28-8 and 815 ILCS 505/1, *et seq.*;

(c)     Entering judgment against Defendants in the amount of the losses suffered by Plaintiffs and each member of the Classes;

(d)     Enjoining Defendants from continuing the challenged conduct;

(e)     Awarding damages to Plaintiffs and the members of the Classes in an amount to be determined at trial, including trebling as appropriate;

(f)     Awarding restitution to Plaintiffs and the members of the Classes in an amount to be determined at trial;

(g)     Requiring disgorgement of all of Defendants' ill-gotten gains;

(h)     Awarding reasonable attorneys' fees and expenses;

(i)     Awarding pre- and post-judgment interest, to the extent allowable;

(j)     Requiring injunctive and/or declaratory relief as necessary to protect the interests of Plaintiffs and the Classes; and

(k)     Awarding such other and further relief as equity and justice require, including all forms of relief provided for under Plaintiffs' claims.

## JURY DEMAND

Plaintiffs request a trial by jury of all claims that can be so tried.

Respectfully Submitted,

**MILAUNCRE MAYHONE AND CATHERINE ROUSSEAU,** individually and on behalf of all others similarly situated,

Dated: July 30, 2025

By: *J. Eli Wade-Scott*
One of Plaintiffs' Attorneys

J. Eli Wade-Scott
ewadescott@edelson.com
Ari J. Scharg
ascharg@edelson.com
Michael Ovca
movca@edelson.com
Hannah Hilligoss
hhilligoss@edelson.com
EDELSON PC
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel: 312.589.6370

*Counsel for Plaintiffs and the Putative Classes*